UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MELANIE E. DAMIAN, as )<br>Special Monitor and Equity Receiver )<br>for the Estate of HUNTER WISE )<br>COMMODITIES, LLC, *et al.*, )<br>                                       )<br>        Plaintiff,            )<br>                                       )<br>v.                                        )<br>                                       )<br>TIMOTHY CAREY and )<br>WINSTON & STRAWN, LLP, )<br>                                       )<br>        Defendants.      ) | Case No. |

## COMPLAINT

Plaintiff, Melanie E. Damian, in her capacity as the Court-appointed Receiver ("Plaintiff" or the " Receiver") for Hunter Wise Commodities, LLC ("HW Commodities"), Hunter Wise Services, LLC ("HW Services"), Hunter Wise Credit, LLC ("HW Credit"), and Hunter Wise Trading, LLC ("HW Trading") (collectively, the "HW Entities"), hereby sues Defendants, Timothy Carey ("Carey") and Winston & Strawn, LLP,  and states as follows:

### INTRODUCTION

1.     This action is brought against a law firm and an attorney for negligently breaching their duties as attorneys and counsel to the HW Entities.

2.     The HW Entities retained the Defendants to guide and counsel them concerning the implications of recent changes to the Commodities Exchange Act (the "CEA") for their business model and regarding the Commodity Futures Trading Commission's (the "CFTC") investigation and enforcement action against the HW Entities.  The Defendants knew or should have known that the HW Entities' business model was illegal, and they negligently failed to

warn the HW Entities that they should make changes or stop operating. The Defendants also knew or should have known that the ongoing operations of the HW Entities in light of the CFTC investigation and enforcement action was counter to the best interests of the HW Entities.

3. As set forth more fully below, the Defendants owed a duty to the HW Entities as attorneys to counsel the HW Entities in a reasonably prudent manner consistent with applicable law. Defendants breached their duties as attorneys in several ways, including failure to gain a complete understanding of the HW Entities' business model and operations and failure to counsel the HW Entities regarding the legal risks of continuing to operate as it did after the changes to the CEA went into effect, including ongoing violations of common law, after the CFTC investigation commenced.

4. On May 16, 2014, he United States District Court for the Southern District of Florida made a final determination contrary to all advice the Defendants had provided and imposed a damages award against the HW Entities in excess of $100 million. Defendants' breaches of their duties as attorneys caused this substantial monetary injury to the HW Entities. Further, the HW Entities paid the Defendants more than $500,000 in attorneys' fees during the course of their representations of the HW Entities. The Receiver files this action to recover the HW Entities' losses.

## THE PARTIES

The Receiver

5. On February 22, 2013, the United States District Court for the Southern District of Florida appointed the Receiver in the action styled *United States Commodity Future Trading Commission v. Hunter Wise Commodities, LLC, et al.*, Case No. 12-81311-CIV-Middlebrooks (the "Receivership Action"). *See* ECN # 4 in the Receivership Action (the "Appointment Order"). In the Appointment Order, the Court in the Receivership Action (the "Receivership

2

Court") initially appointed the Receiver as "Monitor" and granted her the powers of a special monitor and corporate manager over the HW Entities. *Id*. at ECF #77. On February 24, 2013, the Receivership Court further defined and expanded the then Monitor's powers, duties and responsibilities in its *Order on Plaintiff's Motion for Preliminary Injunction*. *Id*. at ECF #78. On May 16, 2014, the Receivership Court entered its Order of Final Judgment, Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief, which, among other things, granted the Monitor "full authority to act as an Equity Receiver for the Hunter Wise entity defendants." *Id*. at ECF #306.

The Defendants

6. Defendant Winston & Strawn, LLP is, and at all times material hereto was, a limited liability partnership, operating as an international law firm with its headquarters in Chicago, Illinois.

7. At all times material hereto, Defendant Carey was an attorney licensed to practice law and practicing law in the State of Illinois. Between 2006 and 2011, Defendant Carey practiced with and on behalf of the law firm Dewey LeBoeuf, in Chicago, Illinois, and from approximately May 2011 to the present, Defendant Carey was a partner in and has practiced law with and on behalf of Defendant Winston & Strawn, LLP. At all times material hereto, Defendant Carey provided the HW Entities with legal services from or through his law offices, including the law offices of Defendant Winston & Strawn, in Chicago, Illinois.

8. At all material times between May 2011 and the present, Defendant Carey was acting within the course and scope of his duties and responsibilities as a partner in the Winston & Strawn Law Firm with the Firm's approval and consent.

3

9. As more fully explained below, the Defendants provided legal services to the HW Entities in connection with, among other issues, the implications of the enactment of Section 742 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act") on the business of the HW Entities and the CFTC investigation of the HW Entities (all discussed in greater detail below).

10. On May 16, 2014, this Court entered a permanent injunction against the HW Entities and their principals, Fred Jager and Ed Martin, and ordered them to pay a civil monetary penalty of $55,445,892.39 and $52,643,399.19 in restitution.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to Title 28, United States Code, Section 754, and the principles of ancillary or supplemental jurisdiction under Title 28, United States Code, Section 1367.

12. This Complaint is brought to accomplish the ends sought and directed by the Receivership Court, which, among other things, appointed Plaintiff as Monitor and Receiver and authorized her to commence actions to recover assets of the Receivership Estate.

13. This Court has diversity jurisdiction over this matter because Defendants are residents and citizens of the State of Illinois, and Plaintiff is a resident and citizen of Florida, and this case asserts claims of more than $75,000.00 in damages, exclusive of legal fees and costs.

14. Defendant Winston & Strawn is subject to the jurisdiction of this Court in that it has a registered agent in, as well as a large office which transacts business in Chicago, Illinois. Upon information and belief, Defendant Timothy Carey is a resident of and practices law in Chicago, Illinois. Further, and, as more fully shown by the facts set forth below, Defendants committed tortious acts within the jurisdiction, and each of the Defendants received transfers of funds, either directly or indirectly, from the HW Entities, which were operating, conducting,

engaging in, and carrying on a fraudulent business or business venture in, among other locations, the Northern District of Illinois.

15. Venue is also proper in the Northern District of Illinois pursuant to Title 28, United States Code, Section 1391(b), because a substantial part of the acts or omissions giving rise to the acts described and the claims set forth in this Complaint occurred in the Northern District of Illinois.

## GENERAL ALLEGATIONS

16. At all times material to this action, the Defendants held themselves out to be experienced in representing individuals and entities in connection with the CEA and related laws, CFTC investigations, enforcement actions, and related matters.

17. On or about May 2, 2011, the HW Entities retained Defendant Tim Carey to represent their interests in connection with a CFTC enforcement action against a dealer, 20/20, with whom the HW Entities had engaged in business. Mr. Carey was introduced and recommended to the principals of the HW Entities by J.B. Grossman, an attorney in Florida who represented the HW Entities at that time.

18. Thereafter, after Defendant Carey left the Dewey LeBouef firm, on May 9, 2012, the HW Entities retained Defendant Carey and the Winston & Strawn firm to represent them and counsel them regarding the implications of the Dodd-Frank Act on the HW Entities' business model, including ongoing compliance issues and the CFTC enforcement action. Attorney J.B. Grossman also continued to represent the HW Entities, along with the Defendants, at that time.

Background of The HW Entities

19. HW Commodities originally was organized in 2007 as a California limited liability company. In January 2010, HW Commodities converted to a Nevada limited liability

company governed by the laws of Nevada. HW Commodities held itself out as "a physical commodity trading company, wholesaler, market maker, back-office support service provider, and finance company" that offered off-exchange financed commodity trading in physical metals.

20. At all times material hereto, HW Services, HW Credit, and HW Trading were wholly owned subsidiaries of HW Commodities. HW Credit and HW Trading are Nevada limited liability companies, and HW Services is a California limited liability company. Together, the HW Entities operated as a common enterprise under common ownership and control.

21. As stated above, at all times material hereto, the Defendants provided legal services to the HW Entities, primarily to HW Commodities and HW Trading.

Fred Jager and Harold Edward Martin

22. At all times material hereto, Fred Jager ("Jager") served as the chief executive officer ("CEO") of the HW Entities, and he was a manager of HW Commodities and, through his companies, South Peak Texas Investments, Inc., Hunter Wise Financial Group, LLC, and Hunter Wise Holdings, LLC, owned the largest percentage of HW Commodites' outstanding membership interests.

23. Harold Edward Martin ("Martin") served as the President, chief operating officer ("COO"), and registered agent of the HW Entities, and he was a manager and majority member of HW Commodities. Martin owned the second largest percentage of HW Commodities' outstanding membership interests.

24. Jager and Martin retained the Defendants on behalf of the HW Entities, and Jager and Martin were the primary representatives and points of contact on behalf of the HW Entities with whom the Defendants communicated.

Overview of the HW Entities' Operations

25. The HW Entities offered retail customers two types of transactions: (1) the purchase or sale of physical precious metals, and (2) off-exchange trading of gold, silver, platinum, palladium, and copper on a leveraged, margined or financed basis. In the latter transactions, the retail customers were led to believe that they purchased physical commodities and paid only a portion of the purchase price and financed the balance of the purchase price. These types of "financed" transactions constituted the vast majority of the HW Entities' business.

26. The HW Entities used a network of retail dealers and telemarketing firms (the "dealers") to solicit retail customers and execute financed transactions with the HW Entities. The HW Entities also used an intermediary entity, Lloyds Commodities, LLC ("Lloyds"), to execute financed transactions between the dealers and the HW Entities. Lloyds functioned principally to accept orders and funds from dealers on behalf of customers and to transmit the orders and funds to the HW Entities. Generally, the customers entered into agreements with their dealers, and the dealers entered into agreements either with HW Commodities or with Lloyds. These agreements governed the customers' purchases and sales of the precious metals, as well as the financing and data processing services.

27. The HW Entities and their dealers' marketing materials and websites represented that (1) retail customers could purchase physical commodities, including gold, silver, copper, platinum, and palladium, by paying as little as 20-25% of the purchase price; (2) the dealers would lend the customers the remaining portion of the purchase price and charge the customer interest on the loan; (3) the customer would receive title to the physical commodities after the

7

financed purchase; and (4) the dealers would store the physical commodities at an independent depository on the customers' behalf.

28. After signing account agreements with the dealers, the customers would place either long (buy) or short (sell) trades to speculate on the price movement of metals. Once the customers agreed to place orders to purchase or sell metals, the dealers contacted the HW Entities or Lloyds, which would then contact the HW Entities, to enter the trades for the customers. The dealers then collected the customer funds and sent them to the HW Entities or to Lloyds, which would forward the funds to the HW Entities.

29. During all relevant times, the HW Entities used several different documents to provide notice and/or confirmation to customers of book entries made on their behalf regarding purchases and sales of metals. These documents included the "Transfer of Precious Metals" document and the "Transfer of Commodity" document. However, for the most part, no actual metals were transferred as part of the transactions. The Defendants assisted the HW Entities with the preparation and use of these documents.

30. The customers' equity increased or decreased as prices of metals fluctuated, while also subject to depletion on a daily basis by interest and service fees. When customers' equity fell below 15% of the value of their total trading position, the customers received margin calls, requiring the customers to deposit additional funds in order to maintain their trading positions. If the customers' equity dropped to 9%, any open trading positions were liquidated.

31. The overwhelming majority of the HW Entities' end customers who entered into financed transactions with the HW Entities, through the dealers or Lloyds, lost money as a result of those transactions, and those losses were compounded by the high commissions and fees that the HW Entities charged.

The Dodd-Frank Act

32.	On July 16, 2011, Section 742 of the Dodd-Frank Act went into effect. The Dodd-Frank Act broadened the scope of the CFTC's jurisdiction to include financed commodity transactions with retail customers. Specifically, this broadened jurisdiction required that such transactions be executed on an exchange and subjected these transactions to anti-fraud provisions as set forth in Sections 4(a) and 4(b) of the CEA, as amended by the Dodd-Frank Act (*see* 7 U.S.C. §§ 2(c)(2)(D), 6(a), 6b, 9, and 15), and the CFTC's regulations promulgated thereunder (*see* 17 C.F.R. §§ 1.1, *et seq.* (2012)). In addition, effective August 15, 2011, Section 753 of the Dodd-Frank Act amended Section 6(c) of the CEA, 7 U.S.C. §§ 9 and 15, broadening the CFTC's anti-fraud jurisdiction as set out in 17 C.F.R. § 180.1.

33.	The Dodd-Frank Act amendments to the CEA require that commodity transactions with individual consumers (like the end customers here) on a leveraged or margined basis or financed by the offeror (like the financed transactions engaged in by the HW Entities) must be done on a regulated commodity exchange. The Dodd-Frank Act allows for exceptions to this requirement if the financed commodities, here the precious metals, are actually delivered to the end customer within twenty-eight (28) days of the transaction or if the applicable contract creates an enforceable obligation to deliver between a seller and a buyer that have the ability to deliver and accept delivery. *See* 7 U.S.C. § 2(c)(2)(D).

The HW Entities' Violations of the Dodd-Frank Act

34.	As determined by the Receivership Court (E.C.N.# 281 in the Receivership Action) and by the United States Court of Appeals for the Eleventh Circuit (749 F.3d 967 (2014), the HW Entities operated in violation of the CEA and, particularly, the Dodd-Frank Act since its

effective date in July 2011 and during the time the HW Entities were represented by the Defendants herein.

35. Specifically, although the HW Entities claimed to supply physical metals to, and provide financing for, financed metals transactions marketed by their dealers, they did not generally buy, sell, loan, store, or transfer physical metals in connection with such transactions. Instead, the HW Entities recorded and tracked customer orders and trading positions, and then managed their exposure to those retail customer trading positions by trading derivatives, such as futures, forwards, and rolling spot contracts, in their own margin trading accounts.

36. The HW Entities allowed customers to take "long" trading positions through purported purchases of metals, and "short" trading positions through what they called "commodity loans." When they received an order and the necessary customer funds from a dealer or Lloyds, the HW Entities made a book entry in a database reflecting the retail customer's transaction.

37. The HW Entities would aggregate the funds received from the dealers and Lloyds and deposit those funds in their own bank accounts. The HW Entities then deposited a portion of those funds in margin trading accounts in the name of a HW Entity with a precious metals supplier or trading institution with which the HW Entities, had signed trading account agreements on behalf of the HW Entities.

38. At no time during the relevant period at issue in this Complaint did the HW Entities have an inventory of physical precious metals that they sold or loaned to customers in connection with financed metals transactions that was sufficient to meet even 15% of their customers' transactions. The HW Entities did not pay in full for the purchase of commodities through their margin trading accounts. Instead, the HW Entities deposited funds with the metals

suppliers or trading institutions as margin in order to trade metals futures or forward contracts on their own behalf to manage their exposure to customer orders.

39. The HW Entities' trading in their margin accounts did not involve the shipment, receipt, or storage of physical metals. The trading institutions with which the HW Entities placed their margin trades did not actually deliver any physical commodities to the HW Entities. The HW Entities did not own, possess, or have title to any metals as a result of their margin trades, and neither did the HW Entities' customers. Any invested equity that the HW Entities did have in trading accounts was never assigned to specific end customers nor to their dealers. The HW Entities did not actually deliver any physical commodities to any of their intermediaries (including but not limited to Lloyds), dealers, or any end customers in connection with financed commodity transactions.

40. At all material times, the Defendants were aware or should have been aware of the HW Entities' business model and of the fact that neither the HW Entities nor its dealers or end customers owned, possessed, or held title to any metals as a result of the HW Entities' margin trades or financed metals sales.

41. At all material times, the Defendants were aware or should have been aware of material misstatements in the documents provided to retail customers.

42. As a result of the above-described business model, the HW Entities operated in violation of the Dodd-Frank Act and common law while they were represented and counseled by the Defendants.

43. On May 16, 2014, the Receivership Court held that the HW Entities "misrepresented facts about the precious metals transactions it oversaw… [and] directly and indirectly led the retail customers to believe metals were stored on their behalf." [Receivership

Action, E.C.N. #303 at p.31]. The Receivership Court further held that "[the HW Entities] failed to inform [retail customers] that the metals it purchased were on a financed basis, it did not own the metals, and the metals, if there were any at all, were not in the retail customers' names." *Id.*

<u>The Defendants Breached Their Fiduciary Duties To The HW Entities</u>

44. As attorneys for the HW Entities, the Defendants owed a fiduciary duty to the HW Entities to, among other things, exercise diligence and care in assuring that the HW Entities operated in compliance with the law and in the best interests of the HW Entities and their investors and customers.

45. In their fiduciary capacities, the Defendants permitted, and, indeed, advised the HW Entities to operate in violation of the law. As set forth above and more fully described below, the Defendants failed to counsel the HW Entities that offering customers off-exchange financed commodity transactions without actually delivering or having the ability to deliver the commodities purportedly purchased by the customers was a violation of the CEA and the Dodd-Frank Act and exposed the HW Entities to substantial penalties.

46. Further, the Defendants allowed the HW Entities to lead end customers to believe that they had purchased commodities on a financed basis and that physical precious metals had been delivered to and were being stored at a depository facility on their behalf when, in fact, the HW Entities did not own, possess, or have title to any metals as a result of their margin trades, and neither did its customers.

47. Since at least the effective date of the Dodd-Frank Act in July 2011, the Defendants knew or should have known that the HW Entities' off-exchange financed metals transactions violated the CEA, as amended by the Dodd-Frank Act.

12

48. The Defendants failed to counsel the HW Entities that their business model violated the Dodd-Frank Act and common law and that, unless the HW Entities changed their procedures for allocating and delivering precious metals on behalf of customers who entered into financed transactions with the HW Entities, the HW Entities would be operating in violation of the CEA and the Dodd-Frank Act. Instead of warning them of the risks, the Defendants stood idly by as the HW Entities continued to operate and allowed the operation of the HW Entities in violation of the Dodd-Frank Act, despite the CFTC's investigation and enforcement action, until they were shut down by the Receivership Court.

49. The eventual shut-down of the HW Entities' operations and the ensuing losses to their customers and creditors could have been avoided if the Defendants had acted in the HW Entities' best interests.

50. The HW Entities were the victims of the continued wrongful acts and omissions of the Defendants, who failed to act in the best interests of the HW Entities.

51. As a result of the Defendants' conduct, the Receivership Court imposed a judgment against the HW Entities, jointly and severally with Jager and Martin, for $52,643,399.19 in restitution and $55,445,892.39 in civil monetary penalties. [Receivership Action, E.C.N. #306 at pp. 4 and 7].

52. During the period of representation alleged herein, the HW Entities paid approximately $523,000 in legal fees to Timothy Carey and Winston & Strawn, LLP.

53. One of the duties of the Receiver is to bring claims against third parties on behalf of the HW Entities for the benefit of the HW Entities' creditors and customers. This lawsuit is brought pursuant to that duty.

54. The Receiver previously filed a lawsuit against these Defendants in the Southern District of Florida on September 19, 2014. The Complaint was dismissed as against the Defendants for lack of personal jurisdiction on April 22, 2015. Case No. 14-cv-23475-KMW (So. Dist. Of Florida) (E.C.N.#39).

55. All conditions precedent to the bringing of this action have been performed or satisfied or have occurred.

**COUNT ONE**
**LEGAL MALPRACTICE**
(All Defendants)

56. Plaintiff hereby reasserts the allegations set forth in paragraphs 1 through 55 as if fully set forth herein.

57. An attorney-client relationship existed between the HW Entities and the Defendants in that the HW Entities retained Defendants to perform legal services in connection with the implications of the Dodd-Frank Act on their business, and later, to represent the HW Entities in connection with the CFTC enforcement action. Each of the Defendants, individually or through individual representatives, performed work for the HW Entities at times from May 2009 through at least February 2013.

58. As a result of the attorney-client relationship between the HW Entities and the Defendants, each of the Defendants owed a duty of care and skill to the HW Entities, including a duty to fully, fairly, and competently represent the HW Entities in connection with the implications of the Dodd-Frank Act on the businesses' operations. The Defendants owed duties to the HW Entities to, among other things, give general legal advice about the changes in the law and the implications of common law violations and to assist the HW Entities by fully researching the HW Entities' business model and the application of the Dodd-Frank Act to determine (i)

whether the HW Entities could continue to operate under their current business model without violating the Dodd-Frank Act; (ii) whether the HW Entities were exposed to risk of damages as a result of the Dodd-Frank Act; (iii) to provide adequate warnings to the HW Entities regarding the legal implications of their ongoing operations; and (iv) to provide competent, responsible legal advice in light of and in connection with the CFTC investigation and enforcement action. The Defendants had a duty to perform the aforementioned duties with the care, skill, and diligence that are ordinarily used by attorneys in the profession.

59. The Defendants failed to exercise the duty of care ordinarily employed by attorneys who are in their profession when performing legal services for the HW Entities in advising the HW Entities in connection with the Dodd-Frank Act and the common law. Defendants should have realized that the HW Entities' business model violated the Dodd-Frank Act and common law. A competent attorney using ordinary care would have effectively warned the HW Entities that they could not continue to operate under their then-current business model without running afoul of the law. This failure to exercise ordinary care amounted to a breach of Defendants' duty of care resulting from their engagement by the HW Entities to perform legal services for them.

60. As a result of the Defendants' breach of their duty to the HW Entities, the HW Entities sustained significant injury and loss. Specifically, the HW Entities' damages include the imposition of more than $100 million in penalties and fines against the HW Entities and the payment of more than $500,000 in fees to the Defendants.

WHEREFORE, Plaintiff Melanie E. Damian, as the Receiver for the HW Entities, hereby demands judgment against the Defendants for the total amount of damages resulting from the

Defendants' legal malpractice committed while acting as the HW Entities' attorneys, plus all attorneys' fees and costs, plus such further relief that this Court deems to be appropriate and just.

## COUNT TWO
## BREACH OF FIDUCIARY DUTY
(All Defendants)

61. Plaintiff hereby re-asserts the allegations set forth in paragraphs 1 through 55 above as if fully set forth herein.

62. As alleged above, the Defendants, as the HW Entities' attorneys, owed a fiduciary duty to the HW Entities, including a duty of loyalty, good faith, and due care.

63. The Defendants breached that duty by, *inter alia*, failing to adequately research the HW Entities' business model and the implications of the applicable changes in the law and in failing to advise the HW Entities that they should not proceed with their ongoing business in the same manner after July 2011 and through the CFTC investigation and enforcement action.

64. That breach proximately caused damages to the HW Entities, including more than $100 million in damages and the payment of more than $500,000 in fees to the Defendants.

WHEREFORE, Plaintiff, Melanie E. Damian, as the Receiver for the HW Entities, hereby demands judgment against the Defendants for the total amount of the HW Entities' damages resulting from the breach of fiduciary duty of the Defendants to the HW Entities, plus costs and interest, and attorneys' fees, if appropriate, and such further relief that this Court deems to be appropriate and just.

## COUNT THREE
## BREACH OF CONTRACT
(Defendant Winston & Strawn, LLP)

65. Plaintiff hereby reasserts the allegations set forth in paragraphs 1 through 55 as if fully set forth herein.

66. Defendant Winston & Strawn and one or more of the HW Entities entered into an agreement (the "Winston & Strawn Retainer Agreement") whereby Winston & Strawn agreed to provide legal services in exchange for fees.

67. Implicit in Winston & Strawn's contractual undertaking to represent the HW Entities is that Winston & Strawn, its respective partners, agents, and employees would exercise the knowledge, skill, and ability ordinarily possessed and exercised by members of the legal profession in similar circumstances.

68. Defendant Winston & Strawn breached the Winston & Strawn Retainer Agreement by failing to provide legal services according to the duty of care provided for therein.

69. As a direct and proximate result of the breach by Defendant Winston & Strawn, the HW Entities sustained significant damages, including more than $100 million in damages and the payment of more than $500,000 in fees to the Defendants.

WHEREFORE, Plaintiff, Melanie E. Damian, as the Receiver for the HW Entities, hereby demands judgment against Defendant Winston & Strawn for all damages to the HW Entities resulting from the breach of contract by Winston & Strawn, plus costs and interest, and such further relief as this Court deems to be appropriate and just.

## CONCLUSION

WHEREFORE, Plaintiff, Melanie E. Damian, as the Receiver for the HW Entities, hereby demands judgment against the Defendants for the total amount of damages resulting from the legal malpractice, breaches of fiduciary duty, and breaches of contract by the Defendants, and such further relief as this Court deems to be appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues and claims so triable.

Respectfully submitted this 15th day of May, 2015.

By:/s/ Drew G.A. Peel

Drew G.A. Peel (ARDC# 6209713)
Kevin B. Duff (ARDC# 6210491)
Andrew E. Porter (ARDC# 6211849)
RACHLIS DUFF ADLER PEEL & KAPLAN, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
(312) 275-0337 dir.
(312) 733-3952 fax
dpeel@rdaplaw.net


Melissa Damian Visconti (Fla. Bar No. 68093)*
DAMIAN & VALORI LLP
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
305-371-3960 gen.
305-371-3965 fax
mvisconti@dvllp.com
*(Application for pro hac vice
admission forthcoming)